## Mildren v. Root et al.

(Decided Feb. 25, 1936.)

EDWARD C. O'REAR and ALLEN PREWITT for appellant.
CARY, MILLER & KIRK and E. B. ANDERSON for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The petition of the appellant, John M. Mildren, against the appellees, C. M. Root and certain of his creditors and mortgagees, alleged that on March 7, 1929, he and Root formed a copartnership under the name of "C. M. Root"; that plaintiff agreed to devote his full time to securing oil and gas leases in different fields and bear his expenses, and Root agreed to advance him $250 to cover those expenses, and to furnish all money necessary to acquire and develop the leases which he should obtain for the partnership; that he, the plaintiff, was to receive one-sixteenth of the net profits from the production or sale of the leases and the same interest in the leases, wells, and equipment acquired for the purpose of developing them; and that pursuant to the agreement he had acquired in the name of C. M. Root certain leases in Ohio county, Ky., and certain royalty interests in other leases in that field. The petition alleged that Root had executed a certain mortgage to his codefendants which embraced a trust arrangement with the First Owensboro Bank & Trust Company as trustee, for the use and benefit of the other defendants. This mortgage, it is charged, was wrongful and for the purpose of securing Root's personal debts. Other grounds were alleged upon which dissolution of the partnership and an accounting were prayed.

Root's answer was a complete traverse. He affirmatively alleged that in January, 1926, he had employed Mildren at a salary of $200 a month while working, out of which to defray all his expenses in securing leases in Texas and other states, and as additional compensation he had orally agreed to pay Mildren one-sixteenth of the net profits realized from the properties; that such additional compensation was not to be paid until after he had been reimbursed the money paid out, and that this employment had continued until the present time. He alleged that on March 7, 1929, he agreed to raise plaintiff's salary to $250 a month, and the plaintiff agreed to devote his full time to this service. Under this arrangement, it is charged the plaintiff had obtained leases in various portions

of Texas and in Kentucky, where the defendant had directed him to go. He set up the sums he had expended and received throughout this period upon the leases procured by the plaintiff, and showed a considerable amount was yet to be earned before he would be reimbursed and there would be any profit   An amended answer set forth in detail all the many leases with the statement of receipts, expenditures, and profits or losses, beginning in November, 1926.   The joint mortgage was alleged to have been made to secure debts incurred in the development and operation of the several leases in Kentucky, and the trust provision, whereby the oil runs were being collected by the trustee, was to liquidate those obligations.   The creditors answered and set up their claims.   It was stated that about $3,000 a month was being received by the trustee and applied to those debts.   One or more of these pleadings contained a denial that the mortgage was taken with the actual knowledge of Mildren's alleged interest in the properties.   About a year after the institution of the suit, Root, by amended answer, pleaded that Mildren had had nothing to do either as a party or as an employee with obtaining what is called the "Wiggington lease," which had been quite profitable. The amendment, it was stated, was made to avoid confusion due to the manner in which the accounts covering this venture appeared on the defendant's books.

Upon an elaborate and extended record judgment was rendered (1) sustaining the mortgage and trust deed, together with the claims of the creditors covered thereby; (2) denying the plaintiff's claim for $750 for unpaid salary or expense money; and (3) adjudging Mildren one-sixteenth interest in and to the profits derived from the Kentucky leases and in the equipment on them, subject, however, to be charged with $61,476.15, the aggregate amount of the unpaid or unrecovered investment which Root had made in the leases acquired by Mildren throughout the country. Upon the matter of accounting, the court found the net proceeds from the Kentucky operations to be $24,181.88. In arriving at this conclusion, the court excluded and disregarded investments or expenditures made by Root in Texas prior to October 22, 1927.

The appellant is maintaining that no part of the investments, expenditures, or losses made or incurred in operations other than those arising after March, 1929,

(which are only the Kentucky leases), are properly chargeable to him. Root, as a cross-appellant, maintains that Mildren is not entitled to share in the profits of the Wiggington lease.

These parties were experienced oil men, trading in and developing leases throughout the country. Each had connections and interests other than with one another. The transactions throughout were loose and informal. There is conflict as to the verbal agreements and as to the construction put upon all of their transactions. Their association or relationship may be divided into five chapters. The decision would seem to depend upon whether these were five separate and distinct ventures, at the conclusion of which the slate was wiped clean in so far as the losses were concerned, or whether they constituted a continuing relationship either of partnership or employment and are to be regarded as a unit. The former is the appellant's contention and the latter is the appellees'. Their respective pleadings and evidence are to that effect.

■ Root testified that Mildren was employed by him on part time to procure leases in 1926 under a verbal contract and upon a salary and an interest in the profits. Mildren says there was no employment except for one venture which was limited to $2,000 expenditure. There is a written contract dated October 28, 1926, by which Root agreed to furnish that sum, and Mildren undertook to secure leases in certain counties in West Texas. Under this Mildren was to receive a salary of $100 a month and expenses; after Root should be reimbursed from the proceeds of the sale of leases, then the remaining leases should be owned equally and jointly. The net loss appears to have been $1,080. There is contradiction as to whether some of the leases obtained between November 29, 1926, and February 11, 1927, were under this writing or under an additional verbal agreement.

■ Another group of three leases were, secured by Mildren in Jack county Tex., on October 22, 1927. Root says this was under the verbal agreement to pay him $200 monthly salary, and he was to be carried for a one-sixteenth part of the profit, the written contract of October 28, 1926, having been ended by mutual consent on April 1, 1927. Mildren testified the arrangements were made by him with Sherman Root, operating under

the name of "Root Drilling Company," which it appears was a partnership composed of C. M. Root and Sherman Root, and in which C. M. Root owned a three-fourths interest. The losses in this venture were $25,-064.64.

Since the result of these two groups of leases or operations were not taken into consideration by the court in rendering the judgment, and no complaint is made by either party concerning that omission, the evidence regarding them is relevant now only as it tends to support the respective contentions of the parties on appeal as outlined above.

■ On May 12, 1928, Mildren secured five certain leases in Young county, Tex. This must have been under a verbal arrangement of some kind, for on July 5, 1928, a writing was signed by the parties reciting that they had been taken for and in the name of Root, who had furnished the money and who was then drilling on one of the leases at his own expense. This expressed the agreement that Mildren was to be assigned an undivided one-sixteenth "working interest" in the leases when and after production, if any, was obtained, and after the money advanced to Mildren and the operating costs had been paid. It was specified that this was a separate contract and in no way connected with the contract of October 28, 1926.

According to the books of Root, the acquisition and development of this group of leases resulted in the loss of $28,314.64. Mildren testified that he was not chargeable with this, but the writing contradicts him.

■ The fourth group of leases in Nolan and Taylor counties, Tex., were obtained October 3, November 26, 1928, and January 12, 1929. Mildren testified he took some of these leases pursuant to a verbal agreement with Sherman Root while C. M. Root was in California. However, they were taken in the name of C. M. Root, and no explanation is offered by Mildren why this was done. The Root Drilling Company, as we have stated, was apparently only the name under which Root developed and operated his properties. Although Mildren states that these leases were taken with the "same understanding," he insists that he was not chargeable with any expense or cost, and "was only in on the net profits." The Martin and Simpson blocks of leases

were taken under the directions of C. M. Root, who agreed to pay his expenses and carry him for one-sixteenth in the net profits. During the four months he was engaged in securing the leases, he was paid $200 a month. Like the others, Mildren says he made no agreement to bear any part of the costs or expenses of development. These leases were obtained for the Root Drilling Company, Mildren testified, but the countervailing evidence is that they were in fact for C. M. Root if they were not really taken in his name. The checks given for salary and expenses at this time were those of C. M. Root, individually, and Mildren was regularly writing him from different places about the deals he was making and hoping to make, and reporting generally what he was doing about these and other matters. There appears to have been an interval of about six weeks after these leases were obtained during which Mildren did nothing for Root. But Root did not claim he was entitled to his full time under the employment (as he construes the relationship), and it would appear that the expense money was to be advanced only while Mildren was engaged in scouting and securing leases and perfecting titles. This group of operations, like the preceding ones, proved costly and yielded nothing. It is very noteworthy that these properties were being developed and that the losses occurred simultaneously with those in Kentucky which we shall consider.

■ We enter upon the fifth chapter. On March 5, 1929, Mildren wrote Root from Abilene, Tex. After giving him some news about different operations, his hopes and purposes, he wrote:

> "You have put money into different places with me and so far we have produced no oil but I am sure our luck will turn if we continue, to make money one must produce oil—To keep up a car, expenses and appearances will cost me about $250.00 per month—if you are willing to furnish this amount, I will devote my full time to getting leases that will get production and at any time to take suggestions or to be directed, me to have 1/16 in net profits of which I secure."

It will be noted that the writer suggested a continuance of their relations in the certainty that their luck would change. However he asked that his allowance

or advancements be made $250 a month. And he agreed to give full time to getting leases and to be subject to Root's directions. As we have stated, the allowance had theretofore been $200 for part time. His compen·sation above these living expenses was to be one-sixteenth of the net profits. Root answered the letter from Los Angeles, suggesting that he should not get discouraged and accepting specifically the proposition Mildren had made to devote his whole time "picking up something in different fields and watching same." He added: "This agreement to be in force till cancelled by writing by both parties." He suggested that Mildren prepare the agreement in duplicate and send to him for his signature. Root testifies that the arrangement or working agreement theretofore existing was not changed, but only the amount of salary and the agreement as to giving full time. A more formal writing was prepared and sent Root, but not being in accord with his understanding, or rather because he wanted the paper to show the previous and future relations in detail, as he subsequently told Mildren, he did not sign it and said that he would prepare one, to which Mildren agreed. Mildren states the conversation differently and makes it appear that Root agreed the writing expressed the entire contract and he had simply been negligent in signing it. However, no other writing was executed.

From that time on advancements were regularly made and Mildren scouted about Texas, Arkansas, Kansas, and Oklahoma, and regularly communicated with Root. Reference was made from time to time to the old leases, but no new ones were obtained. While Mildren was in Kansas, Root suggested that he investigate some Illinois fields. Mildren testified that he turned them down, saying:

"Had I recommended it I would have been in on the losses as I was taking all losses as they come; every transaction I had anything to do with or any transaction I had to manage would be the same proposition was in on my contract."

This would indicate a sense of responsibility for a share in the losses as well as in the profits.

Early in October, 1929, Root directed Mildren to go to Owensboro, Ky. Here in the Kentucky field was the pot of "black gold" at the end of the treasure hunt.

Their luck had changed, as was forecast some six months before.

On account of the loose methods in transacting their business and conflicting evidence, it is difficult to say just what the relationship between the parties was. Whether the view be accepted that there was a continuing special partnership, or a series of joint adventures, or straight-out employment, it seems to us the same end is reached.

The written contract of July 5, 1928, was limited to certain leases and clearly provided for reimbursement of Root before Mildren was entitled to an assignment of one-sixteenth interest. There was no writing between this and the letter of March 5, 1929, but Mildren was still busy in the same activities. Although nothing is recited in the contract as to the payment of salary or expenses, the documentary evidence shows that Root was all the while paying Mildren $200 a month for the time he was engaged. And the leases taken, Mildren testified, were with the "same understanding." Their contemporaneous conduct shows it. We think the evidence manifests a continuance or extension of the terms of the relationship by acquiescence if not by express verbal agreement. While the correspondence in March, 1929, itself would seem to describe an employment rather than a limited partnership, in the light of the previous contract and the continuing relationship during the interim, it may be construed as but a modification of that partnership agreement in the respects stated.

If what we have termed the last three chapters be regarded as separate or special partnerships, as Mildren contends, he cannot escape his liability for one-sixteenth of the losses by virtue of being a partner, nor avoid the right of Root to offset this debt against his one-sixteenth of the profits made in the Kentucky field. That is what the trial court seems to have held. See Jewell v. Janes, 238 Ky. 63, 36 S. W. (2d) 875; Howard v. Gray's Warehouses, 242 Ky. 501, 46 S. W. (2d) 787. On the other hand, if we accept the defendant's view that there was a continuing employment, under the terms of which Mildren was to be paid out of a special fund, to wit, the net profits, then no such fund has yet come into existence out of which payment is to be made. See Fox v. Buckingham, 228 Ky. 176, 14

S. W. (2d) 421; Hibbs-Kiefer Hat Co. v. Schneiderhan, 236 Ky. 470, 33 S. W. (2d) 304. Compare Edwards v. Johnson, 219 Ky. 113, 292 S. W. 750.

We are not impressed with Root's claim on cross-appeal that Mildren had no part in securing the Wiggington lease. There is evidence that if he was not the initiatory cause he at least participated in the acquisition of the lease and we think the trial court correctly included its profits in arriving at the settlement of the accounts between the parties.

We cannot sustain the appellant on the point that the mortgage and trust agreement should have been set aside even upon the hypothesis of a partnership. They included some debts which did not arise from the operation of the leases in which Mildren was interested. They also covered property in which he claimed no interest. There can be no difference of opinion that partnership assets may not be placed in lien to secure personal debts of a partner to the prejudice of the equitable lien of a copartner who has not waived his rights. Hagan v. Hurst, 228 Ky. 645, 15 S. W. (2d) 446; Fyffe v. Skaggs, 246 Ky. 5, 54 S. W. (2d) 369. The properties stood of record in the name of C. M. Root, the mortgagor. The creditors denied knowledge of any undisclosed interest of Mildren, and he did not establish such notice on their part. He cannot now be heard to say that the instruments could not affect his rights. Seeley v. Mitchell's Assignee, 85 Ky. 508, 4 S. W. 190, 9 Ky. Law Rep. 86; Hurtig v. Lebus, 201 Ky. 125, 255 S. W. 1060.

The accounts kept by Root's bookkeeper are presented in minute detail. They cover several volumes. We do not know just how the court arrived at its conclusion that the net profits from the Kentucky operations were $24,181.88, or that $61,476.15 is the sum to be set off as representing the unpaid or unrecovered investments made by Root in the Texas operations. The appellant questions the correctness of the finding as to the profit based upon a certain entry in the books. It seems impossible to follow up the item through the maze of accounts. But, as we understand the argument, if the Texas losses be taken into consideration, the difference is not great enough to change the net result, that is, the conclusion that Mildren is entitled to no judgment against Root. It appears the point had

been reached in the development and operations that there was no hope of ever arriving at a net profit, out of which the appellant could be paid anything. Since we have concurred in the judgment respecting the inclusion of the Texas operations, it does not seem necessary to go into the matter of the accounting.

The judgment is affirmed on both the original and the cross-appeal.